**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERSTATE REALTY CO., L.L.C.,<br><br>Plaintiff,<br><br>v.<br><br>SEARS, ROEBUCK & CO.,<br><br>Defendant. | Civ. No. 06-5997 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

John R. Wenzke, Esq.
Ryan M. Buehler, Esq.
LASSER HOCHMAN, L.L.C.
75 Eisenhower Parkway
Roseland, New Jersey  07068

    *Attorneys for the Plaintiff*

Edward J. Fanning, Esq.
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, New Jersey  07101

    *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

On October 31, 2006, Plaintiff Interstate Realty Company, L.L.C. ("Interstate") filed a complaint against Sears, Roebuck and Company ("Sears") in the Superior Court of New Jersey, Law Division, Morris County alleging breach of contract, tortious interference with prospective economic advantage, and tortious interference with contractual rights and seeking a declaratory judgment. Sears removed the action to this court on December 14, 2006. Sears now moves for summary judgment dismissing all counts of the Complaint. Interstate moves for partial summary judgment finding Sears liable for breach of the covenant of good faith and fair dealing and for tortious interference with Interstate's prospective economic rights. For the reasons set forth below, Sear's motion will be granted in part and denied in part and Interstate's motion will be denied.

## I.  BACKGROUND

Interstate is a limited liability company organized under the laws of the State of New Jersey and is the owner of a 271,000 square foot shopping center on Ridgedale Avenue in the Township of Hanover, New Jersey. The shopping center is known as the Cedar Knolls Plaza ("Cedar Knolls"). Sears is a New York corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois.

**A.      The Lease Agreement with Sears**

In 1995, Interstate and Sears began to negotiate terms of a lease for space in Cedar Knolls. On or about November 21, 1995, Robert W. Kranz, Real Estate Development Director for Sears, sent a letter to Michael Becker of Oster Realty regarding proposed terms for the lease of space at Cedar Knolls. The letter was "drafted for the purpose of setting forth the obligations

that Sears and Landlord must assume respectively in the effort to cause any agreement to become

a reality," but did not bind the parties or assign liability to either party "unless and until a

definitive lease agreement has been negotiated and executed by the parties." (Certification of

Vincent Spina, Feb. 12, 2009, Ex. A.) The letter included a paragraph on "USE/OPERATION,"

which stated, in part, that "[t]he demised premises may be used by Sears for the sale, servicing

and storing of merchandise, all other items or services normally sold in Sears Hardware stores,

and all other lawful retail uses." (Id.) The letter also included a "HARDWARE EXCLUSION,"

which stated that "[f]or so long as Sears operates a Sears Hardware store, Landlord shall not

lease to another tenant whose principal business is paint, hardware and/or lawn and garden

supplies." (Id.) At the end of the letter, Mr. Kranz requested that Mr. Becker sign the letter and

return it to Mr. Kranz so that he could present his proposal to Sears Senior Management for their

approval. The letter was apparently forwarded to Abraham Oster, a principal of Interstate, who

signed it. (Id.)

On or about January 23, 1996, Interstate, as Landlord, entered into a written Lease

Agreement with Sears, as Tenant, whereby Sears leased from Interstate approximately 21,439

square feet of the Cedar Knolls premises (the "Sears Lease").

Paragraph 2 of the Sears Lease is entitled "USE" and reads:

> The Demised Premises may be used by Tenant for the sale, servicing
> and storing of merchandise, all other items or services normally sold
> in Sears Hardware Stores, and all other lawful retail uses. Tenant
> agrees to comply with all Federal, State and governmental laws,
> rules, regulations and ordinances applicable to Tenant's use of the
> Demised Premises. Tenant will set its hours and days of operation, in
> its sole and absolute discretion. Tenant shall have the right to use (a)
> the Outdoor Display Area in order to store, display and sell
> merchandise to the public, and (b) the Common Area Sales Area in
> order to display and sell merchandise to the public in a manner

3

consistent with other Sears Hardware Stores, subject to municipal approval.

(Certification of Edward Fanning, Jr., Feb. 12, 2009, Ex. B.)

Paragraph 39 of the Sears Lease is entitled "Exclusive Use" and reads:

> Landlord represents and warrants to Tenant that Landlord shall not lease any portion of the Entire Tract to any tenant who intends to use more than three hundred (300) square feet of its leased premises, in the aggregate, for the sale of certain items or services which would normally be sold in a "Sears Hardware Store," provided, however, that if any tenant leases more than ten thousand (10,000) square feet of premises in the Entire Tract, such tenant shall be entitled to use up to one thousand (1,000) square feet of its leased premises, in the aggregate, for the sale of certain items or services which would normally be sold in a "Sears Hardware Store." Landlord represents and warrants that Landlord shall include a restrictive covenant in all future leases or amendments to leases relating to the Entire Tract which restricts all other tenants in the Entire Tract from using more than three hundred (300) square feet of leased premises, in the aggregate, or one thousand (1,000) square feet of its leased premises, in the aggregate, if such tenant leases more than ten thousand (10,000) square feet of premises in the Entire Tract, as the case may be, for the sale of items normally sold in "Sears Hardware Stores," including, without limitation, the sale of hardware materials, tools and supplies, paint, plants, and power and non-power lawn and garden equipment, tools and supplies. In the event that any tenant at the Entire Tract shall engage in such sales in violation of the aforesaid exclusive use provision, then Landlord shall take all matters which are necessary in order to enforce for the benefit of Tenant such exclusive use provision, including, without limitation, the filing of any lawsuit at Landlord's sole expense. Notwithstanding the foregoing, Bradlees shall be entitled to use up to two thousand (2,000) square feet of its leased premises, in the aggregate, or the sale of items normally sold in "Sears Hardware Stores."

(Id.) This Exclusive Use Clause was a modified version of the standard exclusive use clause that typically appeared in other Sears Hardware Store leases.

4

The Sears store at Cedar Knolls opened in 1999.  In 1995, the year before the signing of the Sears Lease on January 23, 1996, Sears had 108 Sears Hardware Store locations nationwide and sold the following goods:  dehumidifiers, sinks, faucets, outdoor grills, and humidifiers and accessories.  During 1995, Sears did not sell range hoods, air conditioners, refrigerators, gas or electric free-standing ranges, dishwashers, washers, dryers or freezers.  Sears Hardware Stores have always sold outdoor grills, since before the time that the Sears Lease was signed, through and including February 2006.

In 2002, Sears began a pilot program to convert certain "Sears Hardware Stores" to "Sears Appliance and Hardware Stores."  Sears subsequently converted 75 – 80 of its "Sears Hardware Stores" to "Sears Appliance and Hardware Stores."  In 2004, the Sears Hardware Store in Cedar Knolls was converted into a Sears Appliance and Hardware Store.

Prior to 2002, the Sears Hardware Store at Cedar Knolls did not carry dishwashers, washers, dryers, compactors, ranges and refrigerators.  As of February 2006, the Sears Appliance and Hardware Store at Cedar Knolls sold appliances, including washers, dryers, refrigerators, dishwashers, ranges, ovens, sinks and outdoor grills.

**B.    Lease Negotiations with Karl's**

In the late summer of 2005, Karl's Sales and Service Company, LLC ("Karl's") first began to negotiate with Interstate regarding its possible tenancy in Cedar Knolls.  On or about October 26, 2005, Vincent Spina, a representative of Interstate, forwarded a proposed form of lease to Daniel Schwartz at Karl's.  On November 16, 2005, Karl's sent its comments to Interstate concerning the lease and negotiations continued thereafter.  At some point during the negotiations, Karl's was asked to agree to a covenant in the lease stating that it would not violate

any other exclusive covenants held by other tenants at Cedar Knolls.  (Alexander Dep. 43:17 –

44:11, June 24, 2008.)  Unaware of what exclusive covenants were held by other tenants at

Cedar Knolls, counsel for Karl's requested a copy of all such covenants from Interstate.  (Id.

42:11 – 45:5.)  On January 19, 2006, Mr. Spina sent a fax to Andrea Alexander, Esq., counsel for

Karl's, with a copy of the relevant portions of leases with other tenants at Cedar Knolls.  (Id.)  At

the time, Karl's had a lease at another retail location which was set to expire in the spring of

2006.

**C.     The February 1 Letter and Responses**

The potential lease with Karl's was first brought to the attention of Sears sometime

between January 30 and February 1, 2006.  On or about February 1, 2006, Interstate sent a letter

(the "February 1 Letter") to Sears advising Sears that Interstate was negotiating a lease with

Karl's to rent approximately 13,000 square feet of space in Cedar Knolls.  (Certification of

Edward Fanning, Jr., Feb. 12, 2009, Ex. G.)  In that letter, Interstate informed Sears that Karl's

anticipated it would sell those appliances and ancillary products "customarily sold in an

appliance store, including but not limited to washers, dryers, refrigerators, dishwashers, ranges,

ovens, sinks and outdoor grills."  Interstate requested that Sears sign the letter to acknowledge

that the sale of appliances and ancillary items by Karl's would not be deemed to violate any

terms contained in the Sears Lease.[1]

---

[1] An original draft of the February 1 Letter was written by Ms. Alexander and included the
following language that was deleted in the final draft:  "While some of the ancillary items sold
by Karl's may overlap with those items normally sold in a Sears Hardware Store, these items
will not occupy more than one thousand (1,000) square feet of [sic] in accordance with and as
permitted pursuant to the Sears Lease."  (Certification of Edward Fanning, Jr., Feb. 12, 2009, Ex.
I.)  The original draft also stated,

On February 1, 2006, Heidi Heifetz, the property manager for Sears for the Northeast

Region, including the Cedar Knolls location, sent an email to Mark Flowers, the Vice President

of Sears Hardware Stores, regarding the request from Interstate.  The body of the email stated:

> Our LL has requested Sears approval to add a high-end appliance
> (Viking, etc.) store to this shopping center.  Since the previous
> addition of appliances to Sears store, we now have exclusive rights
> over appliances since they are now "typically" sold in Sears
> Hardware Stores.
> Do you need anything from this Landlord?   Possibly early
> termination, addition of a termination of right, etc.

(Certification of John R. Wenzke, Feb. 12, 2009, Ex. D.)  On February 14, 2006, Ms. Heifetz

emailed Denis Yeso, Manager of Operations-Store Planning for Sears, regarding the issue with

Interstate.  She explained that "[o]ur LL at [Cedar Knolls] wants to add an appliance store to the

plaza.  This may or may not be an Exclusives violation under the Lease.  I am hoping you can

---

> Although the Exclusive Use provision in the Sears Lease does not
> provide Sears with an exclusive right to sell appliances, the Landlord
> is aware that the Sears Hardware Store in the Shopping Center is
> presently selling appliances in addition to hardware items.  Therefore,
> as the Landlord is required to insert a covenant in all future leases
> restricting the sale of those items normally sold in a Sears Hardware
> Store, the Landlord hereby requests that Sears acknowledge, by
> executing where indicated below, that the sale of appliances and
> ancillary items by Karl's will not violate any terms contained in the
> Sears Lease.

The final draft of the February 1 Letter did not include this paragraph except to the extent that it
requested that Sears sign the letter to acknowledge that the sale of appliances and ancillary items
by Karl's would not be deemed to violate any terms contained in the Sears Lease.  In the version
of the letter sent by Interstate to Sears, Interstate simply advised Sears that Karl's anticipated
that it would sell appliances and ancillary products customarily sold in an appliance store,
including but not limited to washers, dryers, refrigerators, dishwashers, ranges, ovens, sinks and
outdoor grills.  Interstate's letter did not advise Sears that Karl's would limit the sale of
competing products to an area less than 1,000 square feet of floor space.

7

answer some questions to help determine that." Her email also included, among others, the two

questions below.  Mr. Yeso's responses are in italics.

> 2.  Would you say the majority of hardware stores in New Jersey and
> also nationally, now sell appliances in its stores?  To prove what is
> "normally" sold in a Sears Hardware Store, I would need a
> percentage of stores for both NJ and nationally that sell appliances.
> *Yes.  The majority of Hardware Stores in New Jersey sell appliances.
> 11 of 14 = 79%.*
> 3.  What type of appliances went into this particular store?  The new
> appliance store would sell washers, dryers, refrigerators, dishwashers,
> ranges, ovens, sinks and outdoor grills.
> *Washers, dryers, refrigerators, ranges, ovens, dishwashers,
> compactors, freezers, outdoor grills.  Grills have always been part of
> the typical hardware assortment.*

(Id. Ex. E.)

By e-mail dated February 16, 2006, Ms. Heifetz responded to Mr. Spina at Interstate that

Sears would view the addition of a Karl's store to the Shopping Center to be a violation of the

Exclusive Use Clause of the Sears Lease.  (Certification of Edward Fanning, Jr., Feb. 12, 2009,

Ex. K.)  Subsequently, Brett D. Smith, Esq., counsel for Sears, had one or more conversations

with John Wenzke, Esq., counsel for Interstate, regarding the matter.  Mr. Smith told Mr.

Wenzke that Sears would consider the matter resolved if Karl's would agree to limit the sale of

appliances that Sears considered to be in conflict with the Exclusive Use Clause in the Sears

Lease to one thousand (1,000) square feet of its store.  (Smith Dep. 30:13 – 32:9, May 29, 2008.)

 The discussion of what appliances were in conflict with the Exclusive Use Clause centered

around price points rather than specific appliances.  (Id.)  Sears did not consider high-end

appliances, such as those made by Viking and Bosch, to be in competition with the products

Sears sold, so the sale of such items by Karl's would not be a violation of the Exclusive Use

Clause.  Mr. Wenzke did not relay this information to Karl's, nor did he relay to Sears the

suggestion made by Karl's in the letter drafted by Ms. Alexander that it would limit its sale of

"ancillary items" that "may overlap with those items normally sold in a Sears Hardware Store"

to no more than one thousand (1,000) square feet of its store.

Mr. Smith also sent a letter, dated April 5, 2006, to Mr. Spina, which stated:

> Tenant considers such Lease [with Karl's] to be in violation of
> Tenant's exclusive use set forth in Section 39 of the Lease and in the
> event Landlord enters into such lease with Karl's Appliances, Tenant
> will view such action a default under the Lease and seek to exercise
> all rights and remedies available to Tenant pursuant to Section 17(b)
> of the Lease.

(Certification of Edward Fanning, Jr., Feb. 12, 2009, Ex. L.)

Sears directed all of its responses, both written and oral, regarding this matter only to

Interstate.  Sears did not copy Karl's on its email or letter to Interstate and did not contact Karl's

directly.

On April 7, 2006, Mr. Wenzke responded to Mr. Smith's letter of April 5, 2006.  Mr.

Wenzke expressed Interstate's position that the Exclusive Use Clause in the Sears Lease was

limited to items normally sold in a "Sears Hardware Store" in 1996 and that Sears was, in fact,

no longer operating a "Sears Hardware Store" at Cedar Knolls and could not "alter or expand the

exclusive use provision of paragraph 39."  Mr. Wenzke also stated that Karl's had refused to

enter into the lease with Interstate "solely because Sears refused to acknowledge that its

exclusive use clause does not apply to Karl's Appliances and Sears has in fact threatened to

bring legal action if such a lease was entered into."  (Certification of John R. Wenzke, Feb. 12,

2009, Ex. F.)

**D.      Addendum Proposed by Karl's**

In March, 2006, after Sears had refused to sign the February 1 Letter, Karl's sent to

9

Interstate a proposed Addendum to the proposed lease for the space at Cedar Knolls.  Under the terms of the Addendum, Interstate would be required to seek a declaratory judgment against Sears regarding the right of Karl's to sell appliances in Cedar Knolls and would be responsible for the cost of such a suit.  Interstate would also be required to defend and indemnify Karl's if Sears brought suit against Karl's seeking injunctive relief or damages related to the operation of its store at Cedar Knolls.  Further, the Addendum required Interstate to pay a minimum of $40,000.00 in liquidated damages to Karl's if a court determined that the lease between Karl's and Interstate violated the Exclusive Use Clause in the Sears Lease.  Karl's would have been willing and able to enter into a lease with Interstate if had Interstate agreed to sign the Addendum, but Interstate was not willing to sign it.  The parties dispute whether there were other outstanding issues regarding the terms of the lease at the time that Karl's and Interstate ceased negotiations, but it is clear from the submissions of the parties that if any issues other than those related to the Sears Exclusive Use Clause remained, there were only a few.  No further agreement was reached between Interstate and Karl's regarding a lease for space at Cedar Knolls.  Karl's signed a lease to occupy its present space in Madison, New Jersey, on or about the same day that it withdrew from negotiations with Interstate.

## II.  DISCUSSION

**A.      Standard of Review for Summary Judgment**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir.

2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.      Contract Interpretation**

Contracts should be construed according to the plain and ordinary meaning of their terms. J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004).  "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract."  Bohler-Uddeholm, Inc. v. Ellwood Group, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotations and citations omitted).  Thus, the court must give force to the intent of the parties by interpreting the Sears Lease according to the plain meaning of its terms. Gleason v. Nw. Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If contractual language is "subject to only one reasonable interpretation," summary judgment may be appropriate.  Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999).  To state the converse, a contract is ambiguous if it is "susceptible of more than one meaning."  Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996) (quotation omitted).  If the meaning of a contract is ambiguous, it is not subject to summary judgment.  As discussed below, all of the terms of the relevant provisions of the Sears Lease are subject to one reasonable interpretation.

**C.      Plain Meaning of the Exclusive Use Clause/Claim for Declaratory Judgment**

The Second Count of Interstate's Complaint seeks a declaratory judgment that Sears does not have the exclusive right to sell appliances at Cedar Knolls.  (Compl. ¶ 36.)  In Paragraph 39 of the Sears Lease, the Exclusive Use Clause, Interstate agreed to include a restrictive covenant in all future leases at Cedar Knolls, which would restrict the other tenants from using more than three hundred (300) square feet (or one thousand (1,000) square feet for tenants who lease more than ten thousand (10,000) square feet) to sell items "which would normally be sold in a 'Sears

12

Hardware Store.'"  Those items "normally sold in 'Sears Hardware Stores'" are defined in

Paragraph 39 to include, "without limitation, . . . hardware materials, tools and supplies, paint,

plants, and power and non-power lawn and garden equipment, tools and supplies."  The term

"Sears Hardware Stores" is in quotation marks throughout Paragraph 39.

Interstate argues that the plain language of the Exclusive Use Clause makes clear that "it

was only applicable when Sears was operating a 'Sears Hardware Store,' and that it only applied

to the sale of hardware store items" such as those listed in Paragraph 39.  Interstate also argues

that the Exclusive Use Clause was limited to those items normally sold in Sears Hardware Stores

in 1996, the year the parties signed the Sears Lease.  Sears argues the opposite extreme.  Sears

contends that the Exclusive Use Clause gives it the exclusive right to sell whatever is normally

sold in Sears stores, or even what is normally sold just at the Cedar Knolls location, at the time

in question – no matter whether the Sears stores are Sears Hardware Stores or have been changed

to Sears Women's Shoe Stores.  Neither party is correct in its interpretation of the Exclusive Use

Clause; rather, the plain meaning of the provision lies in between the two extremes advocated by

the parties.[2]

As Sears correctly notes, the term "normally sold in 'Sears Hardware Stores'" cannot be

read to be limited only to items sold at the Cedar Knolls location.  The Exclusive Use Clause

uses the phrase "normally sold in 'Sears Hardware <u>Stores</u>" (emphasis added) throughout.  If the

parties intended for the clause to be limited to the store at Cedar Knolls, the phrase would have

instead read "items normally sold in the Sears Hardware Store at Cedar Knolls" or something

equivalent to convey that limitation.  There is no such limitation in Paragraph 39 or elsewhere in

_____

[2] Because the plain meaning of Paragraph 39 of the Sears Lease is unambiguous, the November

the Sears Lease.  Thus, the products covered in the Exclusive Use Clause are determined by what is normally sold at "Sears Hardware Stores," wherever they may be.

Sears is also correct that the Exclusive Use Clause does not identify a specific time-period during which the products "normally sold in 'Sears Hardware Stores'" is to be defined. There is nothing in Paragraph 39 or elsewhere in the Sears Lease regarding at what point in time the items "normally sold" in the Sears Hardware Stores is to be determined; there is no language such as "items normally sold in Sears Hardware Stores as of the date of this Lease" or "at the time the Sears Hardware Store opens at Cedar Knolls."  Additionally, there is no time restriction on the enforceability of the Exclusive Use Clause.  It survives as long as the Sears Lease survives.  Because there is no temporal limitation anywhere in Paragraph 39 or elsewhere in the Sears Lease, the list of products "normally sold in 'Sears Hardware Stores'" is to be determined at the time in interest – here, for the purpose of the lease with Karl's, the items normally sold were to be determined in late 2005 and early 2006, the time when Interstate and Karl's were negotiating the agreement.

Sears is incorrect, however, that the Exclusive Use Clause can be expanded to encompass whatever Sears is selling at its Cedar Knolls location.  As discussed above, the Sears Lease grants exclusivity to Sears to sell what is "normally sold in 'Sears Hardware Stores'" – not exclusivity over what is normally sold in the Cedar Knolls location.  Sears is correct that nothing in the Sears Lease prevents it from changing the name of its store and the products it sells at Cedar Knolls, but it does not follow that the Exclusive Use Clause will expand to cover the products sold at its new store, unless those products are normally sold at Sears Hardware Stores

1995 letter regarding the proposed terms for the lease is not relevant and will not be discussed.

14

generally.  The name "Sears Hardware Stores" is in quotations each time it appears in Paragraph 39, which indicates the parties' intention to limit the exclusive rights afforded to Sears to those products normally sold in stores with the name "Sears Hardware Store."  When the store at Cedar Knolls became a "Sears Appliance and Hardware Store," Sears did not lose its exclusive right to sell what is normally sold at "Sears Hardware Stores," but it did not gain the exclusive right to sell what is normally sold at "Sears Appliance and Hardware Stores."  Sears cannot unilaterally change the exclusive rights on which the parties agreed in the Sears Lease by changing the name of its store or the products it sells at its Cedar Knolls location.  Just as Sears would not have the exclusive rights to sell women's shoes at Cedar Knolls if it changed the name of its store to Sears Women's Shoe Store and began to sell shoes, it does not have the exclusive right to sell appliances because it changed its store to a Sears Appliance and Hardware Store.  Rather, the Sears location at Cedar Knolls still has exclusive rights to sell products normally sold at "Sears Hardware Stores" all over the country, even though it is now a Sears Appliance and Hardware Store.  For example, there is no dispute that Sears Hardware Stores have always sold, and continue to sell, outdoor grills; thus, the Sears store at Cedar Knolls still has exclusive rights to sell outdoor grills.

For the foregoing reasons, Interstate's claim for a declaratory judgment that Sears does not have the exclusive right to sell appliances at Cedar Knolls is granted.

**D.      Tortious Interference with Prospective Economic Advantage**

The First Count in Interstate's complaint alleges that Sears tortiously interfered with Interstate's prospective economic advantage.  An action for tortious interference with a prospective economic advantage protects the right to pursue one's business or occupation free

15

from undue influence or molestation.  Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J.

739, 750 (1989).

### i.     Elements of Tortious Interference with Prospective Economic Advantage

To prove a claim of tortious interference with prospective economic advantage, "plaintiff

must show that it had a reasonable expectation of economic advantage that was lost as a direct

result of defendant['s] malicious interference, and that it suffered losses thereby."  Lamorte

Burns & Co. v. Walters, 167 N.J. 285, 305-06 (2001) (citing Baldasarre v. Butler, 132 N.J. 278,

293 (1993)).  In other words, there are four requirements for a claim of tortious interference with

prospective economic advantage:  (1) the plaintiff had a prospective economic or contractual

relationship; (2) the defendant maliciously interfered with that relationship; (3) the interference

caused the loss of the prospective economic gain; and (4) the plaintiff was damaged as a result.

MacDougall v. Weichert, 144 N.J. 380, 404 (1996) (citing Printing Mart, 116 N.J. at 751-52).

The first requirement – prospective economic relationship – need not rise to the level of an

enforceable contract, but it must be a "reasonable expectation" of economic advantage.  Id.

(citing Printing Mart, 116 N.J. at 751).  The second requirement – malice – does not mean ill will

but, rather, means "that harm was inflicted intentionally and without justification or excuse."

Lamorte Burns, 167 N.J. at 306 (quoting Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.,

282 N.J. Super. 140, 199 (App. Div. 1995)).  The third requirement – causation – is satisfied

when the plaintiff demonstrates "'that if there had been no interference there was a reasonable

probability that the victim of the interference would have received the anticipated economic

benefit.'"  Id. (quoting Ideal Dairy Farms, 282 N.J. Super. at 199).

16

### ii.      Sears's Actions Did Not Constitute "Malicious Interference"

Sears argues that Interstate's claim of tortious interference with prospective economic advantage should be dismissed because Interstate cannot prove malicious interference by Sears. "Malice," in the context of a claim of tortious interference with prospective economic advantage, is "determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." Id. (citing Ideal Dairy Farms, 282 N.J. Super. at 199).  The relevant inquiry is often described as "whether the conduct was sanctioned by the 'rules of the game,' for where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury."  Id. (citing Ideal Dairy Farms, 282 N.J. Super. at 199).  In order to be malicious, "[t]he conduct must be both 'injurious and transgressive of generally accepted standards of common morality or of law."  Id. (quoting Harper-Lawrence, Inc. v. United Merchs. & Mfrs., Inc., 261 N.J. Super. 554, 568 (App. Div. 1993)).  "The line is clearly drawn at conduct that is fraudulent, dishonest, or illegal," and while competition may constitute a justification for one's actions, "a defendant claiming a business related excuse must justify not only its motive and purpose, but also the means used."  Id. (citing Ideal Dairy Farms, 282 N.J. Super. at 199).

Conduct spurred by spite and ill-will is not necessarily sufficient to rise to the level of "malice."  Id.  For example, in Ideal Dairy Farms, the plaintiff, a dealer and distributor of dairy products, had terminated its relationship with the defendant and started a relationship with the defendant's competitor.  In response, the defendant canvassed the plaintiff's customers and offered to sell them milk at substantially lower prices than the plaintiff's – prices so low, in fact, that they were unprofitable.  The Appellate Division held that such conduct did not constitute

17

malice; while there was "rivalry and rank animosity" between the two companies, the defendant's conduct did not transgress the rules of the game.  Ideal Dairy Farms, 282 N.J. Super. at 200-02.

In Lamorte Burns, the plaintiff, an insurance claim adjustment firm, filed suit against its former employees, who had resigned from the firm, then used the plaintiff's confidential and proprietary information to solicit the plaintiff's clients.  The defendants faxed their letters of resignation to the plaintiff on a Saturday afternoon, and contacted all of the plaintiff's relevant clients the following morning – a Sunday.  The Supreme Court of New Jersey held that the defendants' secretive taking of the plaintiff's protected client information, combined with the "strategically timed" resignation and immediate solicitation of the plaintiff's clients – what the Court termed a "weekend surprise" – indicated malice.

Here, Interstate alleges that Sears's response to Interstate's request regarding the Exclusive Use Clause was malicious, or violated the "rules of the game."  Interstate requested that Sears sign a letter to acknowledge that the Exclusive Use Clause in the Sears Lease would not be violated by the lease with Karl's.  Sears refused, claiming that it has the exclusive right to sell appliances because they are now "normally sold" in Sears Appliance and Hardware Stores.  While Sears's interpretation of its rights under the lease may be incorrect, it is not so unreasonable as to be malicious.  As Sears argues, the Sears Lease does not specify the time at which what is "normally sold" in a "Sears Hardware Store" is determined.  The Sears Lease also does not state how the Exclusive Use Clause is affected if Sears changes the name of its store from "Sears Hardware Stores" to something else.  Sears's argument that the Exclusive Use

18

Clause grants it the exclusive right to sell whatever is "normally sold" by Sears at any particular point in time may be incorrect, but it is not so unreasonable as to violate the rules of the game.

Further, Sears's actions upon receiving Interstate's February 1 Letter do not indicate malice. Before responding to Interstate's letter, Heidi Heifetz, Sears's property manager for the Northeast Region, emailed Denis Yeso, Manager of Operations-Store Planning for Sears, in order to determine what was "normally sold" in Sears stores at the time. Relying upon what, from all the evidence, appears to have been a good faith belief that Sears did indeed have exclusive rights to sell appliances at Cedar Knoll, Ms. Heifetz then communicated to Vincent Spina at Interstate that Sears would view the addition of a Karl's store to Cedar Knolls to be a violation of the Exclusive Use Clause of the Sears Lease.

Additionally, Sears demonstrated a willingness to discuss the matter with Interstate. Mr. Smith, counsel for Sears, had one or more conversations with Mr. Wenzke, counsel for Interstate, regarding the matter. Mr. Smith told Mr. Wenzke that Sears would consider the matter resolved if Karl's would agree to limit the sale of appliances that Sears considered to be in conflict with the Exclusive Use Clause in the Sears Lease to one thousand (1,000) square feet of its store. (Smith Dep. 30:13 – 32:9, May 29, 2008.) The discussion of what appliances were in conflict with the Exclusive Use Clause centered around price points rather than specific appliances. (Id.) Sears did not consider high-end appliances, such as those made by Viking and Bosch, to be in competition with the products Sears sold, so the sale of such items by Karl's would not be a violation of the Exclusive Use Clause. This information was never conveyed to Karl's, but these conversations are further evidence that Sears was not acting with malicious intent. Rather, Sears was trying to protect what it believed were its rights under the Sears Lease.

19

While Sears may have been incorrect in its assessment of its right under the lease, the assessment was not so absurd as to violate the rules of the game.

Finally, at no time did anyone from Sears communicate directly with anyone at Karl's regarding the matter.  Rather, Interstate controlled the flow of information to Karl's regarding the position Sears took on the Exclusive Use Clause and, in fact, did not communicate to Karl's that Sears would not consider the high-end appliances sold by Karl's to be in violation of the Exclusive Use Clause.

Because Sears did not act with malice in its assertion of what it believed to be its rights under the Exclusive Use Clause of the Sears Lease, Sears cannot be liable for tortious interference with prospective economic advantage.  Therefore, the First Count of the Complaint is dismissed.

**E.      Tortious Interference with Contractual Rights**

The Third Count of Interstate's Complaint alleges tortious interference with contractual rights.  (Compl. ¶ 39.)  "To establish a claim for tortious interference with contractual relations, a plaintiff must prove: (1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage."  Dello Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003) (citing 214 Corp. v. Casino Reinvestment Dev. Auth., 280 N.J. Super. 624, 628 (Law Div. 1994)).  The difference between a claim for tortious interference with contractual rights and tortious interference with prospective economic advantage is that a claim for the former involves an actual contract whereas a claim for the latter involves a prospective contract or other economic benefit.  Essential to both claims, however, is

the requirement that the defendant's actions are not justified or are malicious.  214 Corp., 280

N.J. Super. at 628; Dello Russo, 358 N.J. Super. at 268 ("An individual acts with malice when he

or she intentionally commits a wrong without excuse or justification." (quoting Cox v. Simon,

278 N.J. Super. 419, 433 (App. Div. 1995) (internal quotation marks omitted))).  As discussed

above in the context of Interstate's claim for tortious interference with prospective economic

advantage, Sears did not act with the requisite malice for a claim of tortious interference with

contractual rights.  For the same reasons that Interstate's claim for tortious interference with

prospective economic advantage fails, the claim for tortious interference with contractual rights

fails and the Third Count of the Complaint is dismissed.

**F.      Breach of Contract**

        The Fourth Count of Interstate's Complaint alleges breach of contract.  (Compl. ¶ 42.)

Specifically, Interstate alleges that Sears breached the covenant of good faith and fair dealing.

The Supreme Court of New Jersey has consistently held that all contracts contain an implied

covenant of good faith and fair dealing.  Brunswick Hills Racquet Club, Inc. v. Route 18

Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005); Wilson v. Amerada Hess Corp., 168 N.J. 236,

244 (2001); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997).  "The covenant of

good faith and fair dealing calls for parties to a contract to refrain from doing anything which

will have the effect of destroying or injuring the right of the other party to receive the benefits of

the contract."  Brunswick Hills, 182 N.J. at 224 (quoting Palisades Props., Inc. v. Brunetti, 44

N.J. 117, 130 (1965) (internal quotation marks omitted)).  "Good faith conduct is conduct that

does not 'violate community standards of decency, fairness or reasonableness.'"  Id. (quoting

Wilson, 168 N.J. at 245).  Proof of "bad motive or intention" is essential to a cause of action for

breach of the covenant of good faith and fair dealing.  Id. at 225.  The party claiming a breach of

the covenant "must provide evidence sufficient to support a conclusion that the party alleged to

have acted in bad faith has engaged in some conduct that denied the benefit of the bargain

originally intended by the parties."  Id. (quoting 23 Williston on Contracts § 63:22, at 513-14

(4th ed. 2002) (footnotes and internal quotation marks omitted)).  Additionally, "subterfuges and

evasions" in the performance of a contract violate the covenant even if the actor believes his

conduct is justified.  Id. (citing Restatement (Second) of Contracts § 205 cmt. d).  The covenant

of good faith and fair dealing may be breached even though the express terms of the contract are

not violated, id. at 226 (citing Sons of Thunder, 148 N.J. at 423), but the covenant cannot

override an express term in the contract, Sons of Thunder, 148 N.J. at 419.

Put differently, "[a] party to a contract breaches the covenant if it acts in bad faith or

engages in some other form of inequitable conduct in the performance of a contractual

obligation."  Black Horse Lane Assoc., L.P. v. Dow Chem. Corp., 228 F.3d 275, 288 (3d Cir.

2000).  Thus, a showing of bad faith by the breaching party is the essential element of this claim.

 Wilson, 168 N.J. at 251.  A party "may be entitled to relief under the covenant if its reasonable

expectations are destroyed when a defendant acts with ill motives and without any legitimate

purpose."  Brunswick Hills, 182 N.J. at 226 (citing Wilson, 168 N.J. at 251).  As the Supreme

Court of New Jersey explained in Wilson, a party does not breach the implied covenant of good

faith and fair dealing merely because its decisions disadvantaged another party, and "contract

law does not require parties to behave altruistically toward each other."  168 N.J. at 251 (internal

quotation marks and citation omitted).  For example, in Brunswick Hills, the plaintiff, a tenant,

wished to exercise an option to purchase a ninety-nine-year lease from the defendant.  182 N.J.

22

at 214.  More than a year in advance of the deadline to exercise the option, the plaintiff notified

the defendant, in writing, of its intent to purchase the ninety-nine-year lease, but, under the

mistaken belief that the purchase price was not due until the time of closing, did not tender the

purchase price.  Id. at 229.  As a result, execution of the option remained unperfected.  Id.

During the following nineteen-month period, defendant, through its agents, "engaged in a pattern

of evasion, sidestepping every request by plaintiff to discuss the option and ignoring plaintiff's

repeated written and verbal entreaties to move forward on closing the ninety-nine-year lease."

Id.  The plaintiff's attorneys reached out to defendant and its representatives repeatedly in letters

and telephone calls regarding exercising the lease option, but to no avail.  Id.  The plaintiff even

averred in an estoppel certificate in support of the defendant's application for a bank loan that it

had "exercised its option to convert lease to a fully prepaid 99 year lease . . ."  Id.  But the

defendant never challenged that formal declaration.  Rather, as the defendant admitted, it was not

in its economic interest to allow the exercise of the option, so it waited until after the deadline to

exercise the option had passed and responded to the plaintiff that the option had expired.  Id. at

229-30.  The Supreme Court of New Jersey held that the defendant had breached the covenant of

good faith and fair dealing through "a demonstrable course of conduct [consisting of] a series of

evasions and delays, that lulled plaintiff into believing it had exercised the lease option

properly."  Id. at 231.

     Here, just as Sears did not act with the required "malice" for tortious interference with

prospective economic advantage, there is no evidence that Sears had the bad motive or intention

required for a breach of the covenant of good faith and fair dealing.  Rather, Sears acted based

upon what it believed in good faith to be the correct interpretation of the Exclusive Use Clause in

the Sears Lease.  Upon receipt of the February 1 Letter, Ms. Heifetz immediately emailed Mr. Yeso to determine what was "normally sold" in Sears stores at the time.  Relying upon what, from all the evidence, appears to have been a good faith belief that Sears did indeed have exclusive rights to sell appliances at Cedar Knoll, Ms. Heifetz then communicated to Mr. Spina at Interstate on February 16.  Additionally, Sears demonstrated a willingness to discuss the matter with Interstate.  Counsel for Sears had one or more conversations with counsel for Interstate regarding the matter and suggested that Sears would consider the matter resolved if Karl's would agree to limit the sale of appliances that Sears considered to be in conflict with the Exclusive Use Clause to one thousand (1,000) square feet of its store.  (Smith Dep. 30:13 – 32:9, May 29, 2008.)  Sears did not consider high-end appliances to be in competition with the products Sears sold, so Sears agreed that the sale of such items by Karl's would not be a violation of the Exclusive Use Clause.  This information was never conveyed to Karl's, but these conversations are further evidence that Sears did not act with bad motives or intentions.  While its interpretation of the Exclusive Use Clause was incorrect, such an interpretation did not violate community standards of decency, fairness or reasonableness.  Indeed, Interstate's interpretation of the Exclusive Use Clause was also incorrect.  Each party simply advanced an interpretation of the Sears Lease which would benefit it, but there is no evidence of "ill motives" on the part of Sears or Interstate.  Accordingly, the Fourth Count of the Complaint is dismissed.

### III.  CONCLUSION

For the reasons set forth above, the First Count (tortious interference with prospective economic advantage), the Third Count (tortious interference with contractual rights), and the Fourth Count (breach of contract) of the Complaint are dismissed.  Summary judgment on the Second Count (declaratory judgment) is granted to Interstate.  The Court will enter an order implementing this opinion.


_____s/ Dickinson R. Debevoise_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: April 27, 2009